No. 14-1459

# In the United States Court of Appeals for the Federal Circuit

SYNQOR, INC.,

Plaintiff-Appellant,

v.

ARTESYN TECHNOLOGIES, INC., ASTEC AMERICA INC.,
BEL FUSE, INC., MURATA ELECTRONICS NORTH AMERICA, INC.,
MURATA MANUFACTURING CO., LTD., MURATA POWER SOLUTIONS, INC.,
AND POWER-ONE, INC.

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS (SCHNEIDER, J.)
CASE NO. 2:11-CV-444

## OPENING BRIEF OF APPELLEES MURATA, BEL FUSE, AND ASTEC/ARTESYN

Albert B. Deaver, Jr.
SUTTON MCAUGHAN
DEAVER PLLC
Suite 900
Three Riverway
Houston, TX 77056
(713) 800-5700

*Counsel for Artesyn
Technologies, Inc. and
Astec America, Inc.*

October 20, 2014

John C. O'Quinn
Jason M. Wilcox
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
(202) 879-5000

*Counsel for Murata Power
Solutions, Inc., Murata Electronics
North America, Inc. and Murata
Manufacturing Co., Ltd.*

*additional counsel on inside cover*

Steven N. Williams
MCDOLE WILLIAMS, PC
Suite 2750
1700 Pacific Avenue
Dallas, TX 75201
(214) 979-1122

*Counsel for Bel Fuse, Inc.*

Steven Cherny
KIRKLAND & ELLIS LLP
601 Lexington Avenue
Citigroup Center
New York, NY 10022
(212) 446-4800

*Counsel for Murata Power
Solutions, Inc., Murata Electronics
North America, Inc. and Murata
Manufacturing Co., Ltd.*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, the undersigned counsel for Defendants-Appellees Murata Manufacturing Co., Inc., Murata Electronics North America, Inc., and Murata Power Solutions Inc. certifies the following:

    1.   The full name of every party or *amicus* represented by me are:

Murata Manufacturing Co., Ltd, Murata Electronics North America, Inc., and Murata Power Solutions Inc.

    2.   The name of the real party in interest represented by me is:

Not applicable.

    3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

Murata Manufacturing Co., Ltd. is the parent corporation of Murata Electronics North America, Inc., which in turn is the parent corporation of Murata Power Solutions, Inc.  Murata Manufacturing Co., Ltd. has no parent corporation and no publicly held company owns 10 percent or more of its stock.

    4.   The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this court are:

KIRKLAND & ELLIS LLP:    Steven C. Cherny, John C. O'Quinn, Eric R. Lamison, Sarah Kao-Yen Tsou, Simeon G. Papacostas, Jason M. Wilcox, Diwei Zhang

POTTER MINTON P.C.:  Michael E. Jones, E. Glenn Thames, and Jason Dwain Mazingo

Fish & Richardson P.C.:  Alan D. Smith, Steven R. Katz, Warren K. Mabey, Jr., Kevin Su, Whitney A. Reichel

Dated October 20, 2014             */s/ John C. O'Quinn*
                                   _____
                                   John C. O'Quinn

i

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, the undersigned counsel for Bel Fuse, Inc. certifies the following:

    1.    The full name of every party or *amicus* represented by me are:

Bel Fuse, Inc.

    2.    The name of the real party in interest represented by me is:

Not applicable.

    3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

There are no parent corporations and/or publicly held companies that own 10 percent or more of Bel Fuse, Inc.'s stock.

    4.    The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this court are:

KENNEDY CLARK & WILLIAMS, P.C.; MCDOLE KENNEDY & WILLIAMS, PC; MCDOLE & WILLIAMS, PC; MCDOLE WILLIAMS, PC:   Steven N. Williams, Kenneth B. Kula, Kristen E. Knauf, William Zac Duffy, Jane Du

Dated October 20, 2014              */s/ Steven N. Williams*
                                    Steven N. Williams

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, the undersigned counsel for Defendants-Appellees Artesyn Technologies, Inc. and Astec America Inc. certifies the following:

    1.   The full name of every party or *amicus* represented by me are:

Artesyn Technologies, Inc. and Astec America Inc.

    2.   The name of the real party in interest represented by me is:

Not applicable.

    3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

Prior to January 2014, Artesyn Technologies, Inc. and Astec America Inc. were both wholly owned subsidiaries of Emerson Electric Co., which is a public company traded on the New York Stock Exchange (Symbol EMR).

Effective during the first quarter of 2014, Platinum Equity, a Los-Angeles-based private equity firm, acquired from Emerson Electric Co., a majority interest in Artesyn Technologies, Inc., as well as Artesyn's interests in worldwide subsidiaries, which included Astec America Inc. Emerson Electric Co. retained a 49% stake in the business.

    4.   The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this court are:

SUTTON MCAUGHAN DEAVER PLLC:  Albert B. Deaver, Jr.; Robert J. McAughan, Jr.; Jeffrey A. Andrews

WILSON ROBERTS & CORNELIUS PC:  Jennifer P. Ainsworth, William J. Cornelius, and Matthew T. Milam

Locke Lord Bissell & Liddell LLP:  Nathaniel C. Dunn

Finnegan Henderson Farabow Garrett & Dunner, L.L.P.:  Donald R. Dunner, Erik R. Puknys, Jason W. Melvin

Dated October 20, 2014           */s/ Albert B. Deaver, Jr.*
                                  Albert B. Deaver, Jr.

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ..................................................ix

INTRODUCTION .......................................................................... 1

STATEMENT OF THE ISSUES ...................................................... 5

STATEMENT OF THE CASE AND THE FACTS ................................ 6

I.    Prior *SynQor I* Litigation ................................................ 6

II.    Cisco Implemented A Successful Post-Verdict Parallel
Fulfillment System To Avoid Importing Accused Converters ...... 11

III.    The Post-Verdict Actions Of MPS, Bel Fuse, And Astec ............... 14

    A.    MPS Took Deliberate Actions To Prevent
Infringing Importations ........................................... 14

    B.    Bel Fuse Took Deliberate Actions To Prevent
Infringing Importations ........................................... 19

    C.    Astec Took Deliberate Actions To Prevent
Importation Of Accused Converters ..................................... 20

        1. Astec Rigorously Complied With The Injunction-Notice
And Red-Dot Safeguards For Its Sales To Cisco ................... 20

        2. Astec Did Not Ship Converters To Juniper In the
United States, and Juniper Took Steps To Ensure It
Did Not Import Products Containing Astec Converters ....... 23

IV.    Proceedings Below ........................................................ 25

SUMMARY OF ARGUMENT .................................................. 27

STANDARD OF REVIEW ........................................................ 32

ARGUMENT ........................................................................ 33

I.    The District Court Correctly Found No Inducement After
April 11, 2011, And No Inducement By Astec During Other
Relevant Times ................................................................ 33

A.  MPS, Bel Fuse, And Astec Did Not Have The Requisite Knowledge Or Intent To Induce Infringement During The Relevant Times ........................... 34

1. MPS Did Not Have The Knowledge Or Intent Required To Induce Cisco's Alleged Direct Infringement After April 11, 2011 ........................................................................ 35

2. Bel Fuse Did Not Have The Knowledge Or Intent Required To Induce Cisco's Alleged Direct Infringement After April 11, 2011 ................................................ 41

3. Astec Did Not Have The Requisite Knowledge Or Intent To Induce, And SynQor Failed To Prove Direct Infringement By Juniper ...................................................... 46

B.  The District Court Did Not Clearly Err In Finding SynQor Could Not Meet The Exacting Standard For Willful Blindness ............................................................... 56

II. The District Court Correctly Found MPS, Bel Fuse, and Astec's Infringing Sales Between January 25 and April 11, 2011, While The Injunction Was Stayed, Were Not Willful .......... 62

A.  SynQor Is Precluded From Challenging The District Court's Willfulness Finding ..................................... 62

B.  The Stay Of The Injunction Establishes the Post-Injunction Conduct of MPS, Bel Fuse, and Astec Was Not Objectively Willful ................................................. 64

III. The District Court Correctly Found That This Is Not An Exceptional Case ............................................................................ 71

CONCLUSION ........................................................................ 74

# TABLE OF AUTHORITIES

**Page(s)**

<u>**CASES**</u>

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.,*
  960 F.2d 1020 (Fed. Cir. 1992) ..............................................67

*Advanced Fiber Technologies (AFT) Trust v. J & L Fiber Servs., Inc.,*
  674 F.3d 1365 (Fed. Cir. 2012) ..............................................69

*Allen Organ Co. v. Kimball Int'l, Inc.,*
  839 F.2d 1556 (Fed. Cir. 1988) ..............................................32

*Amado v. Microsoft Corp.,*
  517 F.3d 1353 (Fed. Cir. 2008) ...................... 4, 30, 63, 64, 65, 66, 67, 73

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
  314 F.3d 1313 (Fed. Cir. 2003) ..............................................32

*Amrollah v. Napolitano,*
  710 F.3d 568 (5th Cir. 2013) ................................................63

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.,*
  682 F.3d 1003 (Fed. Cir. 2012) ........................................32, 67, 68, 69

*Bott v. Four Star Corp.,*
  807 F.2d 1567 (Fed. Cir. 1986) ..........................................66, 67

*Commil USA, LLC v. Cisco Sys., Inc.,*
  720 F.3d 1361 (Fed. Cir. 2013) ........................................33, 36, 41

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,*
  567 F.3d 1314 (Fed. Cir. 2009) ..............................................70

*East Tex. Med. Center Regional Healthcare Sys. v. Lexington Ins. Co.,*
  575 F.3d 520 (5th Cir. 2009) ..........................................46, 53

*Engel Indus., Inc. v. Lockformer Co.,*
  166 F.3d 1379 (Fed. Cir. 1999) ..............................................63

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  131 S. Ct. 2060 (2011) .............................................. 34, 36, 41, 46, 58, 59

*Highmark Inc. v. Allcare Health Management Sys., Inc.*,
  134 S. Ct. 1744 (2014) ............................................................................. 32

*In re Seagate Tech., LLC*,
  497 F.3d 1360 (Fed. Cir. 2007) (*en banc*) ................................. 67, 68, 70

*Joyal Prods., Inc. v. Johnson Electric N. Am., Inc.*,
  2009 WL 512156, *13-14 (D.N.J. Feb. 27, 2009) ................................. 67

*Limelight Networks, Inc. v. Akamai Tech., Inc.*,
  134 S. Ct. 2111 (2014) ............................................................................. 51

*Martin v. Franklin Capital Corp.*,
  546 U.S. 132 (2005) ................................................................................. 69

*Martinez v. Texas Dep't of Criminal Justice*,
  300 F.3d 567 (5th Cir. 2002) ................................................................. 72

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
  420 F.3d 1369 (Fed. Cir. 2005) ............................................................. 60

*Minn. Mining & Mfg. Co. v. Chemque, Inc.*,
  303 F.3d 1295 (Fed. Cir. 2002) ............................................................. 37

*Mirror Worlds , LLC v. Apple, Inc.*,
  692 F.3d 1351 (Fed. Cir. 2012) ............................................................. 53

*National Liability & Fire Ins. Co. v. R & R Marine, Inc.*,
  756 F.3d 825 (5th Cir. 2014) ................................................................. 32

*Nken v. Holder*,
  556 U.S. 418 (2009) ..................................................................... 65, 68, 69

*Nunez v. Allstate Ins. Co.*,
  604 F.3d 840 (5th Cir. 2010) ................................................................. 72

*Octane Fitness v. ICON Health & Fitness, Inc.*,
  134 S. Ct. 1749 (2014) ..................................................................... 5, 31, 72

vii

*Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.,*
  170 F.3d 1373 (Fed. Cir. 1999) ............................................................. 62

*Riverwood Int'l Corp. v. R.A. Jones & Co.,*
  324 F.3d 1346 (Fed. Cir. 2003) ............................................................. 72

*Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.,*
  459 F.3d 1311 (Fed. Cir. 2006) ............................................................. 71

*Toshiba Corp. v. Imation Corp.,*
  681 F.3d 1358 (Fed. Cir. 2012) ............................................................. 53

*United States v. Ekanem,*
  555 F.3d 172 (5th Cir. 2009) ................................................................. 32

*United States v. Mares,*
  402 F.3d 511 (5th Cir. 2005) ................................................................. 72

*Vita-Mix Corp. v. Basic Holding, Inc.,*
  581 F.3d 1317 (Fed. Cir. 2009) ............................................................. 53

## OTHER AUTHORITIES

35 U.S.C. § 285 .......................................................................................... 32

Fed. R. Civ. P. 52(a)(6) ...................................................................... 30, 32

## STATEMENT OF RELATED CASES

This case was severed from *SynQor, Inc. v. Artesyn Techs., Inc.*, No. 2:07-cv-497 (E.D. Tex.) (*SynQor I*). This Court granted stays of the permanent injunction in that case in *SynQor, Inc. v. Artesyn Techs., Inc.,* Nos. 2011-1191, -1192, -1193, -1194 (Fed. Cir. 2011) (Linn, J.), and modified those stays in *SynQor, Inc. v. Artesyn Techs., Inc.*, 410 F. App'x 336 (Fed. Cir. 2011) (Rader, Newman, Bryson). The judgment in that prior case was appealed to this Court in *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365 (Fed. Cir. 2013) (Rader, Lourie, Daniel (by designation)).

A case currently pending in the Eastern District of Texas, *SynQor, Inc. v. Cisco Sys., Inc.*, No. 2:14-cv-286 (E.D. Tex.), could be affected by the decision in this appeal.

# INTRODUCTION

This case was severed from the prior *SynQor I* case so that "*[i]f* SynQor [could] prove that Defendants induced … infringement of its patents during the post-injunction time period, then it will be entitled to compensation for that infringement."   A57694 (emphasis added). After a four-day bench trial, the district court weighed the evidence and found that SynQor failed to carry its burden of proof on inducement of infringement for sales of accused power converters by MPS, Bel Fuse, and Astec (collectively "Appellees") after April 11, 2011—when this Court modified the stay of the *SynQor I* injunction and Appellees altered their sales practices—as well as for certain other sales by Astec.

After April 11, all of MPS's, Bel Fuse's, and Astec's sales of accused converters were *foreign* sales intended solely for *foreign* use. That is what they told Cisco and what Astec told Juniper, and that is what Cisco and Juniper told them.[1]  To that end, each converter was marked and coded pursuant to special procedures implemented during overseas manufacturing and assembly to ensure that it would not be

---

[1]  Astec is the only Appellee that sold converters to Juniper during the periods relevant to this appeal.

1

used in U.S.-bound products, and each converter was packaged with instructions clearly indicating it was solely for foreign use, including a copy of the *SynQor I* injunction.   Far from intending to induce importation, the evidence was overwhelming that Appellees (and their customers) sought to *prevent* importation.   The district court heard the evidence about the extensive inventory management procedures that were implemented from witnesses for MPS, Bel Fuse, Astec, and their customer Cisco, as well as how Appellees stopped shipments altogether until these procedures could be implemented.   Based on the weight of the evidence and the court's assessment of the witnesses' credibility, it properly found no intent to induce infringement for sales made pursuant to these special procedures.

On appeal, SynQor seeks to relitigate the facts, asking this Court to disregard the district court's findings and credibility determinations and believe instead that the costly, painstaking procedures implemented by Appellees, Cisco, and Juniper were all an elaborate ruse.   In doing so, SynQor relies on a caricature of the stay requests made to this Court in *SynQor I* and a distortion of Appellees' indemnity agreements with their customers.   SynQor's view is that Appellees'

2

statements in January 2011, that Cisco and Juniper would likely need their converters for U.S. use through September 2011, *forever* trump everything Appellees *actually did* to avoid importation after this Court modified the stay of the injunction in *SynQor I* on April 11, 2011 (and, in Astec's case, even earlier). That makes no sense. Indeed, this Court ultimately modified the scope of the stay based on *SynQor's* contrary representations about Cisco's needs. Regardless, circumstances change. The district court heard all the evidence and rightly rejected SynQor's theory.

Similarly, regarding Astec's sales to Juniper, SynQor had no evidence that *any* accused converters were imported in Juniper's end-products. Again, SynQor's theory was that Astec's request for a stay dispensed with the need for actual evidence of direct infringement.

The district court further found that sales between January 24 and April 11, 2011 were not willful precisely because they were made in accordance with a stay of the injunction pending appeal. Not content with the royalty it recovered, SynQor challenges that finding too. As an initial mater, however, SynQor has forfeited this issue. In the final judgment in *SynQor I*, the district court previously found that sales

3

between January 24 and April 11, 2011 were not willful, and SynQor did not appeal that issue. But even setting that aside, SynQor is wrong on the law. This Court's decision in *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008), prohibits a finding of willfulness when there is a stay pending appeal—and rightly so. An important point of a stay is to protect the public interest. But no accused infringer would have any incentive to continue sales that benefit the public if such sales are subject to treble damages. Likewise, granting a stay pending appeal necessarily requires a finding that there is a reasonable likelihood of success on appeal. By definition that means that the Appellees' defenses must be reasonable, and thus the objective prong of willfulness cannot be satisfied.

Finally, SynQor appeals the district court's finding that this was not an exceptional case, arguing that the court applied the pre-*Octane* standard. But SynQor did not preserve this issue below, and thus waived it under binding Fifth Circuit law. In any event, no reasonable factfinder could conclude that this case "stands out from others with respect to the substantive strength of [SynQor's] litigating position." *Octane Fitness v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1755

4

(2014). To the contrary, the only thing exceptional about this case is SynQor's overreach—including numerous additional baseless theories it pursued at trial but has abandoned on appeal—in hopes of a richer recovery. This Court should affirm the judgment and, after seven years of litigation, bring this matter to a close.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly found, after a four-day bench trial, that:

   a. MPS, Bel Fuse, and Astec did not have the requisite knowledge or intent to induce allegedly infringing importations by Cisco after April 11, 2011.

   b. SynQor failed to prove Juniper directly infringed by importing products with accused Astec converters after January 24, 2011.

2. Whether the district court correctly concluded that MPS, Bel Fuse, and Astec did not engage in willful conduct in making sales between January 24, 2011 and April 11, 2011.

3. Whether the district court correctly denied SynQor's request for an exceptional case finding and attorney's fees.

## STATEMENT OF THE CASE AND THE FACTS

MPS, Bel Fuse, and Astec manufacture high-efficiency DC-DC power converters, called intermediate bus converters, used to power circuitry in large computer systems and telecommunication and data communication equipment. *SynQor I*, 709 F.3d at 1373.[2] Those converters are manufactured overseas and sold to companies, such as Cisco and Juniper, which in turn incorporate those converters into their products. *Id.*

## I.    Prior *SynQor I* Litigation

SynQor previously sued Appellees and others for allegedly infringing five patents—U.S. Patent Nos. 7,072,190 (A402-21), 7,269,034 (A422-41), 7,272,021 (A442-58), 7,558,083 (A459-91), and 7,564,702 (A492-527)—related to unregulated and semi-regulated intermediate bus converters. *See* A53924. On December 21, 2010, a jury found Appellees infringed or induced infringement of SynQor's patents and awarded damages. *See* A8419 ¶¶ 6-7.

---

[2] MPS refers to Murata Power Solutions, Inc.; Bel Fuse refers to Bel Fuse, Inc.; and Astec refers to Artesyn Technologies, Inc. and Astec America Inc. The district court dismissed SynQor's claims against Murata Electronics North America, Inc. and Murata Manufacturing Co., Ltd. because SynQor "did not pursue [ ] claims" against those entities "at trial." A7 n.2.

SynQor subsequently moved to enjoin foreign sales of the accused bus converters to customers who import products into the United States unless Appellees could "reasonably demonstrate[] to SynQor that the customer is capable of ensuring and takes measures to ensure that its imports into the United States exclude" the accused converters. *See* A52519-20. The district court in *SynQor I* rejected SynQor's foreign-sales bar, recognizing that it would "impose unnecessary restraints on lawful … extraterritorial sales." A51840-41. It instead entered a permanent injunction that explicitly permits foreign sales so long as the bill of sale or the packaging for each converter includes "a copy of [the injunction] Order" and a notice that, because of the injunction, the converter "is [n]ot for sale in, [u]se in, or [i]mportation into the United States." A56891. That injunction order issued on January 24, 2011, but the district court temporarily stayed its prohibitions while Appellees and others sought a stay pending appeal from this Court. *See* A56893; A56983.

In the stay applications filed with this Court, those parties argued a stay was appropriate because there was a strong likelihood that this Court would hold SynQor's patents invalid. *See, e.g.*, A10755-61.

Appellees also said that a temporary stay was warranted because certain customers, including Cisco and Juniper, required a reasonable amount of time to fully transition to non-infringing alternatives. *See, e.g.*, A10435; A10443.   They therefore requested the stay extend through September 30, 2011, because Cisco indicated it "typically" could take that long to fully transition all of its affected products to non-accused converters.   A10207 ¶ 17; A10199-200 ¶ 14; *see also* A9796[125:2-17].   Cisco never indicated, however, that it could not transition at least some—and possibly all—of its products to non-infringing converters before September 2011.   *See* A10207 ¶ 17; A10199-200 ¶ 14; A9898[45:1-10].  SynQor vigorously opposed the stay, arguing that it alone was capable of fulfilling the substantial majority of Cisco's U.S. needs, *see* 1/31/2014 SynQor Fed. Cir. Br., No. 2011-1191 at 4; *id.* at 17; A9796[126:8-14], and that together, with its licensee Ericsson, they could likely fulfill *all* of Cisco's U.S. needs, *see* 2/4/2014 SynQor Fed. Cir. Opp. to Cisco's Mot. to Intervene, No. 2011-1191 at 12; A9796[126:15-23].

On January 31, 2011, this Court agreed a stay was appropriate "pending further consideration" of the stay request.  A56992; A56996;

8

A57008. That original stay remained in place through April 11, 2011, when this Court modified it. *See* A52213-16. In the April 11, 2011 order modifying the stay, the Court partially rejected Appellees' argument that SynQor was unable to meet Cisco's needs, finding that SynQor converters had been qualified for three Cisco part numbers that "account for over 67% of Cisco's disclosed U.S. sales of end products containing the bus converters at issue." A52216. The Court, thus, lifted the stay to just those parts. *Id.* It left the stay in place, however, for all other converter models Appellees sold until "the earliest of" September 30, 2011 or the date SynQor could provide "a technically qualified replacement." *Id.*

Meanwhile, SynQor sought supplemental damages for sales made after October 31, 2010 (the date through which the jury assessed damages). *See* A57018. The district court awarded supplemental damages through January 24, 2011—the date of the injunction order—but declined to award supplemental damages for sales made after that date. *See* A57693-94. According to SynQor, supplemental damages for sales after January 24, 2011 were appropriate because Appellees' continued sales coupled with their requests for a stay were sufficient to

9

find those parties continued to induce infringement. *See* A57593[254:19-23]. The district court disagreed because it saw "a lot of objective evidence that, you know, they didn't have any intent." *Id.*[256:2-3]. Because of that objective evidence, the district court did not see "how [SynQor] can say I can make that giant leap" that continued sales and a request for a stay are sufficient to establish an intent to induce. *Id.*[255:23-24].

The district court instead informed the parties that it would sever the case to address possible infringement and supplemental damages after January 24, 2011. *See* A57694. Its order also established ground rules for the liability and damages inquiry for the post-January 24 time period, specifically holding that "any infringement by Defendants during the stay of the injunction is not willful." *Id.* SynQor did not appeal that ruling. This Court subsequently affirmed the jury's *SynQor I* verdict and the district court's supplemental damages award. *See SynQor*, 709 F.3d 1385.

## II.    Cisco Implemented A Successful Post-Verdict Parallel Fulfillment System To Avoid Importing Accused Converters

Both before and after the jury's verdict, Appellees' customer Cisco worked to implement and refine a parallel fulfillment system to segregate converters that could be used in the United States from those that could not. *See* A9896[39:11-17], A9900[54:2-18]. That process required its contract manufacturers—companies that manufacture Cisco's end-products—to separate converters received from Appellees and others into three separate bins upon receipt—"Bin A," "Bin B," and "Bin C." *See* A9901[57:18-21]. Bin C converters were designated exclusively for Cisco products bound for markets outside the United States. *Id.* at 60:5-9; A52239; A52278.

To further support separation of products made abroad for use outside the United States, Cisco developed a "red-dot" procedure that required Appellees physically to mark each converter intended for Bin C (and thus exclusively for foreign use) with a red-dot mark. A9934[25:10-21]; A9899[51:2-6, 51:11-23].



A52046.  Appellees also agreed to add readily visible "REMARK" labels on each box and each carton of each shipment intended exclusively for foreign use stating that the parts "shall not be sold or shipped to the United States."  A52046-47;  *see* A9934[25:22-25]; A9899[51:7-10, 51:25-52:25].

To confirm "Bin C" converters affixed with the red-dot labels were properly segregated, Cisco's contract manufacturers programmed electronic information onto each circuit board that included an accused converter.  *See* A9900[53:13-21].  That electronic information recorded whether the converter came from Bin A, Bin B, or Bin C.  *Id.*  If a product incorporating a Bin C converter was incorrectly assigned to a U.S.-bound order, an electronic check performed by the contract manufacturer would return an error and inform the contract manufacturer that the product could not be shipped to that customer.  *See* A9902[62:11-24; 63:5-25]; A52232; A52266-67.

The parallel fulfillment system worked. According to Cisco's records, very few Bin C converters were inadvertently incorporated into products that ultimately reached the United States market. *See* A9903[65:13-14; 67:5-17]. Even SynQor's Arthur Hoffman admitted that no SynQor employee has seen a red-dot converter in the United States. *See* A9797-A9798[131:4-133:6].

In conjunction with this parallel fulfillment process, Cisco also transitioned away from using accused MPS, Bel Fuse, and Astec converters to meet its U.S. needs. Cisco did not intentionally use any of Appellees' accused converters purchased after April 11, 2011 to satisfy its U.S. needs. A9897[41:3-21]. Cisco instead met its U.S. needs after April 11, 2011 by using unaccused, fully regulated converters it asked Appellees and others to create in response to SynQor's suit, as well as converters from SynQor, Ericsson, NetPower, and other suppliers not involved in this case, and by using its pre-existing inventory. A9896-A9897[38:22-39:4; 41:8-21; 42:10-13].

This alternative supply of converters was not sufficient to meet Cisco's U.S. needs for all of its products. A9898-A9899[48:12-49:2]. As such, there were occasions when Cisco went "line down" and

13

temporarily stopped shipping some products into the United States. *Id.* Even then, Cisco did not intentionally include any of MPS's, Bel Fuse's, or Astec's post-April 11 "Bin C" in its products. *Id.*

## III.  The Post-Verdict Actions Of MPS, Bel Fuse, And Astec

### A.    MPS Took Deliberate Actions To Prevent Infringing Importations

After the December 2010 jury verdict, MPS's senior management team immediately met to discuss how to respond to the verdict. *See* A9931[15:21-16:6].   It initially stopped all shipments of accused converters, not just to the United States but worldwide. *Id.*   MPS communicated that decision to Cisco. *See id.* at 16:7-19.  After further discussions, MPS ultimately decided to continue shipping converters to Cisco. *See id.* at 16:7-24, A9932[19:7-9].  MPS based that decision on its belief that SynQor's patents are invalid and that the PTO would eventually cancel the asserted claims; its belief that this Court would overturn the verdict on appeal; and its desire to help a valued customer meet its immediate needs in a legally permissible way while there was no injunction prohibiting its sales. *See* A9931[16:20-24], A9932[18:24-19:9].

14

MPS again immediately stopped all shipments of the accused converters worldwide after the district court entered the permanent injunction on January 24, 2011. *See id.* at 19:15-23. That decision came directly from MPS's then-CEO, Christopher Conlin, who sent a memorandum to all MPS personnel ordering that all "shipping, manufacturing, sales, and marketing" of "non-regulated and semi-regulated bus converters" stop "[e]ffective immediately." A52573; A9932[20:7-13]. Tim Brown, MPS's senior quality manager, entered a formal stop order halting all manufacturing and shipping activity at MPS as well as its contract manufacturer for the converters at issue. *See* A51993-52005; A9932[20:14-21]. Shipments resumed only after MPS learned that the district court and the Federal Circuit had stayed the injunction. *See* A9932-A9933[20:22-21:4].

During the stay period prior to April 11, 2011, MPS resumed supplying converters to Cisco for use in the United States and elsewhere around the world. It recognized, however, that it could have to pay damages to SynQor for those sales—despite its good-faith belief that SynQor's patents are invalid and that the Federal Circuit would overturn the jury's verdict. A9931-A9932[16:25-17:4; 18:24-19:1];

15

A9933[22:12-16].   MPS subsequently asked Cisco to bear that risk by entering into an indemnification agreement.   *See* A52011-13.   But while negotiating that agreement, MPS also made clear that if the injunction took effect MPS "would immediately stop all shipments to Cisco regardless of th[e] agreement."   A9933[22:17-24]; A9833[113:25-114:2].

On April 12, 2011—one day after this Court modified its stay— SynQor informed Cisco that any future purchase of several MPS converter models would violate the modified injunction.   A9792[111:5-112:2]; A12569-70.   SynQor provided MPS with similar warnings. A9792-A9793[112:23-113:9].   Because SynQor had simply offered to sell Cisco products SynQor "believed could replace[]" the accused converters, SynQor claimed it had established it could provide a technically qualified replacement.   A9785[84:10-25], A9787[91:9-24].

Although Appellees disagreed with SynQor about whether SynQor's products were "technically qualified" replacements, out of an abundance of caution, MPS immediately stopped *all* shipments of the accused converters to Cisco—whether for U.S. or foreign use—for nearly a month.   A9933[23:6-14]; A9899[49:21-50:1].   MPS stopped shipments,

16

despite the indemnity agreement, because it was unwilling to risk violating a court-ordered injunction. A9933[23:15-22].

While all shipments were stopped, MPS focused its efforts on incorporating the injunction-notice and red-dot procedures into its manufacturing processes so that its products would not be subsequently imported into the United States. A9934[25:10-25]; A9899[50:17-23]; A52043-47. Implementing that process required significant expenditures of time and resources by MPS. For example, more than a dozen schematics or "design final assembly drawings" for its converters had to be changed. A9942[57:7-15; 58:11-59:3]; A52059-63. Each of those changes required an engineering change order and approval by a committee at MPS. A9942[58:14-21, 59:4-12]; A52064-66.

Shipments from MPS to Cisco resumed on May 5, 2011, after MPS "[v]ery, very clearly" informed Cisco that it could no longer use any of MPS's accused converters in U.S.-bound products. A9933[23:23-24:1], A9934[26:22-27:1]. Although this Court's stay remained partially in place, because of ambiguity regarding the meaning of the term "technically qualified" in the stay order, MPS insisted that Cisco

17

operate as if the injunction was fully in effect.  A9934[25:10-12, 25:22-25]; A9902-A9903[64:21-65:11].

Each product shipped after May 5, 2011 included not only the red-dot markings but also a copy of the permanent injunction and a notice with the product itself and on the bill of sale that the product was subject to the injunction and not for use or sale in the United States. A9934[26:1-12]; A52065; A52067.   MPS also required Hip Fung, its contract manufacturer in Asia, to implement robust internal quality-assurance processes and process-documentation safeguards to ensure Hip Fung employees were properly trained on the injunction-notice and red-dot precautions and actually implemented those procedures for each product shipped.  A9941-A9942[55:6-23, 56:23-57:6].  In addition, an employee of Hip Fung and an on-site MPS employee verified both notice of the injunction and a red-dot were included before releasing any given shipment for delivery.  *Id.*; A9934[26:13-21]; A52048.

MPS had no reason to believe the injunction-notice and red-dot safeguards were not successful in keeping its converters out of the United States.  To the contrary, MPS saw its sales to Cisco of the accused converters drop from 46,000 in the first quarter of 2011 to less

18

than 22,000 converters in the second quarter—a more than 50% decline—as well as a significant reduction in its Cisco sales volume in the first half of 2011 compared to that same period in 2010.  A9857-A9858[64:4-65:15]; A9934-A9935[27:10-17, 28:17-29:7]; A52087-52111.

## B. Bel Fuse Took Deliberate Actions To Prevent Infringing Importations

Like MPS, Bel Fuse continued shipping converters to Cisco after January 24, 2011, and entered into an indemnity agreement with Cisco. *See* A12580-82.  However, Bel Fuse stopped all shipments to Cisco shortly after April 11—despite the indemnity agreement—because of this Court's modified stay and SynQor's assertion that any future purchase of Bel Fuse's accused converter models would violate the injunction.  A9792[111:5-112:2]; A12569-70; A9899[49:12-50:1].

Bel Fuse only resumed shipments after Cisco "assured" it that Cisco would keep converters shipped after April 11 outside the United States.  A9948[83:2-21]; *see also* A9947-A9948[80:14-81:19].  Bel Fuse did not simply accept those assurances.  Rather, it also requested detailed information on the process Cisco was using—a process that Cisco informed Bel Fuse was "very tightly controlled."  A9948[83:2-21]; A12601-02.  Once shipments resumed, every single shipment of Bel

19

Fuse converters complied with the terms of the district court's injunction and Cisco's red-dot procedures. *See* A9944[66:6-67:5]; A9947-A9948[80:14-81:19]; A9949[85:25-86:8].

### C. Astec Took Deliberate Actions To Prevent Importation Of Accused Converters

#### 1. Astec Rigorously Complied With The Injunction-Notice And Red-Dot Safeguards For Its Sales To Cisco

Astec also responded quickly to the December 2010 jury verdict. Within two days of that verdict, Astec issued internal "stop ship" instructions for the accused bus converters. *See* A9812[29:24-30:10]; A9823[75:19-76:17]. Astec then informed its customers, including Cisco and Juniper, that it would not sell those converters to any customer for use in the United States and that any foreign converter sales would require a commitment by the customer not to subsequently import the converter (or the product containing the converter) into the United States. *See* A9823-A9824[76:18-77:24]. Juniper agreed to those conditions, but Cisco asked Astec to reconsider because of Cisco's immediate need for Astec converters in its equipment. *See* A9812-A9813[30:16-19; 33:12-33:19]; A9824[78:9-78:16; 80:7-80:18].

Astec agreed to assist Cisco in satisfying its U.S. needs absent an injunction. *See* A9823-A9824[76:18-77:24]. As part of that agreement, Cisco promised to indemnify Astec for damages resulting from any post-verdict sales, including Astec's attorney's fees. A9812[30:16-31:23]; A9824[80:7-82:10]. Astec hoped Cisco's heightened financial exposure due to the indemnity agreement would discourage Cisco from using Astec's converters and would motivate Cisco instead to seek out alternative sources to meet its need for intermediate bus converters. A9825[81:8-82:10].

This strategy worked, as Cisco asked Astec to implement the red-dot procedure for marking converters as foreign-use-only soon after the January 24, 2011 injunction order, even though it was stayed. A9827[89:2-15]; A12918-20. By February 1, every shipment of Astec converters to Cisco included the red-dot safeguards against U.S. importation. *See* A9827-A9828[89:16-90:13; 93:5-13]. This included several shipments that Astec had packaged shortly before Cisco's request to convert to the red-dot procedures. A9827[90:3-11]. Each converter in those already-packaged shipments had to be unpacked, marked with a red dot, and repackaged for shipment to Cisco. *Id.* Each

21

of Astec's shipments after February 1 likewise complied with and went beyond the injunction-notice requirements. *See* A9827-A9828[89:16-90:13; 93:5-13]. Notice of the injunction was "on every single box" and on the invoice. A9822[71:25-72:21]. And, to make sure that those notices were not overlooked, the notices were printed on prominent, orange labels. *See id.*; A12910.

Subsequently, on March 16, 2011, Cisco asked Astec to provide shipments that were not subject to the injunction-notice and red-dot procedures. A12921-22. Astec agreed because the injunction was stayed. A9827[91:14-92:8]. Although Astec understood that these unmarked shipments could potentially be used in some U.S.-bound products, Astec did not suspect—indeed, had no reason to suspect—that Cisco might also want to import converters into the United States from *prior* marked shipments that complied with the injunction-notice and red-dot procedures. A9817[50:5-52:6]; A9827-A9828[91:9-13; 93:14-94:11].

Less than one month later, on April 11, 2011, Astec stopped all shipments to Cisco after this Court modified its stay. A9899[49:12-50:1]. SynQor informed Cisco after the stay was modified that any

22

future purchase of Astec's accused converter models for U.S. importation would violate the modified injunction. A9792[111:5-112:2]; A12569-70. Astec only resumed foreign shipments once it re-instituted the injunction-notice and red-dot safeguards. *See* A9827[92:4-20]. Every Astec shipment to Cisco after April 11, 2011 included those safeguards against importation. *Id.*

> ### 2.  Astec Did Not Ship Converters To Juniper In the United States, and Juniper Took Steps To Ensure It Did Not Import Products Containing Astec Converters

In response to Astec's announcement that it would no longer ship accused converters for use in the U.S., A9823-24[76:18-77:24]; A9951[96:2-6], Juniper agreed in writing on January 12, 2011, that it would not import into the United States accused converters or Juniper product containing accused converters, A9951-52[96:24-97:3]. By January 24, 2011, Astec had likewise stopped all U.S.-bound converter shipments to Juniper and its contract manufacturers. A9953[102:16-20].

Juniper also implemented safeguards similar to those Cisco employed to ensure that foreign-made product containing Astec converters were not imported. During the relevant period, for example,

Juniper required that Astec mark all of the accused converters shipped to Juniper's foreign locations with a yellow dot.  A9953[102:21-103:20].



A12931.  That marking system remained in place throughout the relevant time period, and there is no indication it was ineffective. A9953[102:21-103:20].

To create a financial disincentive against violating the no-import agreement, Astec also required Juniper to indemnify Astec for SynQor's damages and attorney fees up to $200 per converter if any product containing Astec converters were imported into the United States or if Juniper requested Astec to ship converters into the United States. A9952[98:8-99:6];  A12698-12700.    Astec reasonably believed the Indemnity Agreement made it "a lot cheaper" for Juniper to negotiate a license with SynQor than have to pay Astec under the indemnity. A9952[99:3-6].

24

## IV.   Proceedings Below

After it was severed from *SynQor I*, this case was re-assigned from Judge Ward to Judge Schneider.   A528; A531.   The parties took additional discovery related to liability and damages for sales occurring after January 24, 2011.  Thereafter, the district court granted summary judgment to Power-One, Inc.  *See* A80-81.  As to Appellees, the district court then held a four-day bench trial in July and August 2013.  *See* A172-73.

SynQor's theory at trial was that MPS, Bel Fuse, and Astec must have intended to induce Cisco to continue importing converters into the United States after January 24, 2011.  This was so, in SynQor's view, because they continued making foreign converter sales to Cisco, entered into indemnity agreements with Cisco, and requested a stay of the permanent injunction.   SynQor also sought over $33 million in damages, including treble damages for willful infringement.  *See* A8520*;* A9022; A10005[98:11-15].   The damages model underlying that $33 million demand assumed that Cisco imported 73% of the foreign converters it purchased from Appellees into the United States and that Appellees would have agreed to pay $60 per imported converter.  *See*

A9841[146:9-15].   SynQor pursued the same theory with respect to Astec's foreign converter sales to Juniper after January 24, 2011, and sought damages based on a model that assumed a 50% importation rate.

The district court entered its findings and conclusions on March 31, 2014.   *See* A5.   On liability, the district court found "that Defendants' actions after April 11, 2011, demonstrate a lack of intent to induce infringement."  A35.  The district court, after reviewing all of the evidence, concluded "th[at] evidence shows Defendants immediately altered their behavior after the Federal Circuit entered its April 11, 2011 order," by implementing the injunction-notice and red-dot procedures, and reasonably "reli[ed] on the fully implemented Bin C procedure."  A35-36.  The district court likewise found Astec did not infringe between February 1 and March 16, 2011 for the same reason.  A31-32.  And it found Astec was not liable for its converter sales to Juniper because Juniper did not import any of Astec's accused converters into the United States.  A23.  The only acts of inducement by any defendant found by the district court were the sales to Cisco between January 24 and April 11, 2011—while the injunction was fully

26

stayed—that did not include the injunction-notice and red-dot safeguards. A22-23. Finally, the district court found those infringing acts were not willful because the sales "were pursuant to a court-ordered stay." A34.

On damages, the district court rejected SynQor's assumed importation rate and its $60 per-unit royalty as inflated, instead applying the importation rate applied by the jury and a reasonable royalty based on the jury's findings in *SynQor I*, to award approximately $3 million total in damages. *See* A26-28; A1-2. The district court also rejected SynQor's request for an exceptional case finding and attorney's fees. A38.

The district court entered final judgment April 30, 2014. A1-2.

## SUMMARY OF ARGUMENT

The district court correctly concluded that Appellees did not induce any allegedly infringing acts by Cisco after April 11, 2011 (and that Astec did not induce any allegedly infringing acts by Juniper after January 24, 2011, or allegedly infringing acts by Cisco between February 1, 2011 and March 16, 2011), that any acts of inducement

occurring after January 24, 2011 were not willful, and that this is not an exceptional case entitling SynQor to attorney's fees.

*First*, the district court's finding that Appellees did not induce infringement after April 11, 2011 (and, for Astec, during other periods as well) was not clearly erroneous. SynQor acts as though requesting a stay of the *SynQor I* injunction and entering into indemnity agreements *before* April 11, 2011 irrevocably created an intent to induce infringement during the entire period for which a stay was requested. The district court properly rejected that argument and decided this case based on the *evidence* of Appellee's actions *after* this Court modified the stay on April 11, 2011 (and for Astec, during other periods as well). Appellees, for example, immediately stopped all shipments to Cisco after this Court modified its stay. Those shipments did not resume until Appellees implemented extensive safeguards, including marking each converter sold to Cisco for foreign use only and including a copy of the *SynQor I* injunction with each shipment. The significant effort required to implement those safeguards shows they were far from window-dressing or an elaborate scheme to mask ongoing infringement.

The district court properly found that Appellees lacked the intent to induce and instead acted to *avoid* infringing importations.

The district court likewise properly rejected SynQor's assertion that Appellees were willfully blind to purported infringement after April 11, 2011. SynQor's theory starts from the false premise that Appellees had an obligation to ask Cisco how it would meet its U.S. needs once they implemented procedures specifically designed to keep accused products out of the United States. In fact, there was extensive evidence from which Appellees could infer that Cisco could meet its U.S. needs without using their accused converters. And there is no evidence that, had they asked, Appellees would have uncovered evidence of purported infringement. That is fatal to SynQor's willful-blindness allegations, which the district court properly rejected.

Regarding Astec's sales to Juniper, the district court correctly found that Astec did not induce infringement because Juniper did not directly infringe. There is simply no evidence that Juniper imported products that included an Astec converter. Nothing about Astec's request for a stay so that Juniper would have the option of including accused Astec converters in its U.S. products *required* the district court

to find that Juniper actually included those converters in its U.S. products.

In short, SynQor's arguments on appeal largely ask this Court to re-weigh the evidence considered by the district court. That is precisely what the clearly erroneous standard under Rule 52(a)(6) forbids.

*Second*, the district court was exactly right that any inducement during this Court's stay of the January 24, 2011 injunction was not willful. As an initial matter, SynQor is collaterally estopped from challenging that decisions because the district court in *SynQor I* reached the same conclusion. Having chosen not to appeal that decision, SynQor is now bound by it. Regardless, in *Amado v. Microsoft Corp.*, this Court already held that infringement during the stay of a permanent injunction is not willful. *See* 517 F.3d 1353, 1362 (Fed. Cir. 2008). That makes sense. A stay pending appeal is almost invariably justified in part on the public harm that would result if the infringing activity immediately ceased. Few adjudicated infringers, however, would continue meeting the public's needs at the risk of treble damages.

*Amado* aside, a stay of an injunction also forecloses objective willfulness. A stay requires a finding that the stay applicant has made

a showing that it is likely to succeed on the merits of its appeal. An argument that the court concludes is reasonably likely to succeed on the merits cannot also be unreasonable.

*Third*, the district court properly denied SynQor's motion for an exceptional case finding and attorney's fees. Because Appellees did not willfully infringe, SynQor's principal challenge to the district court's finding that this is not an exceptional case fails. SynQor waived its alternative argument that the district court applied the wrong legal standard. SynQor agreed with that standard below, and the Supreme Court's recent decision in *Octane Fitness v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1755 (2014), modifying the "exceptional case" standard does not allow SynQor to raise that challenge for the first time on appeal. Under applicable Fifth Circuit law, intervening Supreme Court decisions do not excuse untimely arguments. Regardless, no reasonable factfinder could conclude this case is exceptional. SynQor is the appellant in this court for a reason. It *lost* almost every single substantive issue in this case.

## STANDARD OF REVIEW

Infringement, including whether a party had the intent to induce infringement, is a factual question. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1339 (Fed. Cir. 2003); *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed. Cir. 1988). A district court's factual findings are reviewed only for clear error. See Fed. R. Civ. P. 52(a)(6); *Amgen*, 314 F.3d at 1339. The clearly erroneous standard is a demanding one, which is satisfied only if this Court "is left with a definite and firm conviction that a mistake has been made" after reviewing the record as a whole. *National Liability & Fire Ins. Co. v. R & R Marine, Inc.*, 756 F.3d 825, 830 (5th Cir. 2014) (quotation marks omitted); *United States v. Ekanem*, 555 F.3d 172, 175 (5th Cir. 2009).

The ultimate question of willfulness is a question of fact. Objective willfulness is a question of law reviewed *de novo*, while subjective willfulness is reviewed for clear error. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1006, 1008 (Fed. Cir. 2012). Whether a case is exceptional under 35 U.S.C. § 285 is reviewed for an abuse of discretion. *See Highmark Inc. v. Allcare Health Management Sys., Inc.*, 134 S. Ct. 1744, 1749 (2014).

# ARGUMENT

## I. The District Court Correctly Found No Inducement After April 11, 2011, And No Inducement By Astec During Other Relevant Times

Because this is an inducement case, SynQor was required to prove at trial that MPS, Bel Fuse, and Astec acted with the "specific intent to encourage another's infringement" after April 11, 2011 (and, for Astec during other periods as well).[3] *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1368 (Fed. Cir. 2013). SynQor acts, however, as though the only thing that matters are actions Appellees took long before April 11, 2011—before they implemented substantial procedures designed to keep their accused products *out* of the United States. Specifically, SynQor argues that the district court was wrong to find no inducement because Appellees had previously requested a stay of the *SynQor I* injunction and ultimately entered indemnity agreements with Cisco. As far as SynQor is concerned, those actions forever established an intent to induce infringement, regardless of the actions MPS, Bel Fuse, and

---

[3] In addition to its post-April 11, 2011 sales, Astec lacked the intent to induce infringement through sales to Juniper after January 24, 2011, and through its sales to Cisco between February 1 and March 16, 2011, because it intended—and instructed Juniper and Cisco—that such sales were only for use outside the United States. Moreover, as discussed below, there was no evidence of direct infringement by Juniper.

33

Astec each subsequently took, particularly after this Court modified the stay on April 11, 2011. That is wrong on the facts and the law. The district court properly rejected that myopic view and decided this case on the evidence presented at the four-day bench trial—evidence showing MPS, Bel Fuse, and Astec acted to *avoid* inducing infringement. The district court's decision is not clearly erroneous.

The district court also correctly rejected SynQor's argument that Appellees were willfully blind, because they continued selling foreign converters to Cisco (and in Astec's case, Juniper)—specifically designated for use outside the United States—without asking how those companies would meet their U.S. needs. Willful blindness is an exacting standard. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070-71 (2011). SynQor's theory—that Appellees had an obligation to ask how Cisco (or Juniper) would meet its U.S. needs once they implemented procedures specifically designed to keep accused products out of the United States—starts from a false premise and provides no basis for overturning the district court's factual findings.

### A. MPS, Bel Fuse, And Astec Did Not Have The Requisite Knowledge Or Intent To Induce Infringement During The Relevant Times

1.   **MPS Did Not Have The Knowledge Or Intent Required To Induce Cisco's Alleged Direct Infringement After April 11, 2011**

As the district court found, the actions MPS took after April 11, 2011, do not demonstrate the knowledge or intent required to prove MPS induced importation of accused converters by Cisco.  To the contrary, as soon as this Court modified its stay of the injunction on April 11, 2011, MPS *stopped all shipments to Cisco for nearly a month* as it implemented procedures to ensure accused converters would not be subsequently imported into the United States.  *See* A9934[25:10-25].  MPS resumed shipments only after it "very, very clearly" informed Cisco that it could no longer use any infringing MPS converters in U.S.-bound products.  A9933-A9934[23:23-24:1, 25:10-25, 26:22-27:1].  For all sales after April 11, 2011, MPS implemented the intricate red-dot procedures designed by Cisco to ensure marked products would not be used in the U.S., as well as the foreign-sales notice provision of the district court's injunction.  *See* A9934[25:10-25, 26:1-21]; A9941-A9942[55:6-23; 56:23-57:6].  MPS took compliance so seriously that it required its contract manufacturer and an MPS employee to verify in writing that each shipment contained the requisite notices before a

35

shipment could be released.  A9941-A9942[55:6-23, 56:23-57:6]; A52067; A52048.

These safeguards were not window dressing.  Implementing them not only required significant changes to MPS's manufacturing and shipment processes, but also other development efforts by MPS.  More than a dozen schematics (or "design final assembly drawings") for its converters had to be changed to implement the safeguards.  A9942[57:7-15, 58:11-59:3]; A52059-63.  Each of those changes required an engineering change order and approval by a committee at MPS. A9942[58:14-21, 59:4-12]; A52064-66.  As the district court correctly recognized, MPS's actions are simply not those of a company that intends (much less encourages) U.S. importations of its products to continue.

Moreover, inducement requires more than intent.  It requires "knowledge that the inducted acts constitute patent infringement." *Global-Tech*, 131 S. Ct. at 2067-68; *Commil*, 720 F.3d at 1367.  Yet there is no evidence that MPS had any knowledge that the injunction-notice and red-dot safeguards were (purportedly) ineffective in keeping accused converters sold after April 11, 2011 out of U.S.-bound end-

36

products. Senior executives at MPS "did not receive any complaints" or hear of any "anomalies in the process." A9934[27:2-9]; A9935[30:4-11]. Rather, MPS saw what it would have expected when its converters could not be used in the U.S.—a decline in sales of its accused converters, dropping from 46,000 units in the first quarter of 2011 to less than 22,000 converters in the second quarter, more than a 50% decline. A9934-A9935[27:10-17; 28:17-29:7]; A52087-111. SynQor's own damages expert conceded this drop in sales was indicative that the process was working. A9857-A9858[64:14-65:19], A9873[126:16-127:2]. The district court did not clearly err by finding that this evidence "demonstrate[s] a lack of intent to induce infringement" and a lack of knowledge regarding Cisco's purported infringement. A35-36. Absent knowledge and intent, MPS simply cannot be liable for inducement. *See Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1295, 1304-05 (Fed. Cir. 2002).

Nothing SynQor points to in its brief required the district court to ignore MPS's post-April 11, 2011 actions, much less demonstrates clear error. SynQor's dogged insistence that MPS must have intended to induce given its arguments to this Court in support of a stay request

several months earlier in time are baseless.  The fact that MPS honestly believed in January 2011, when it asked this Court for a stay, that Cisco might need MPS's converters for U.S. use through September 2011 is beside the point.  *See* SynQor Br. at 47-48.  Events had changed by April 11, 2011.  By then, this Court had agreed with SynQor—not Appellees—that SynQor could meet much of Cisco's U.S. needs and modified the scope of the stay.  A52215-16.  Appellees are not forever bound by an unsuccessful argument months earlier about what might happen in the future.  And by April 11, 2011, Cisco had progressed further in replacing some accused converter models with non-accused, fully regulated converters.  *See* A9897-A9898[44:6-15, 46:16, 47:2-17]; A52895-909.  The notion that Cisco never told MPS that its U.S. needs had changed is simply irrelevant.  *See* SynQor Br. at 48.  MPS was aware that Cisco had other suppliers—including SynQor itself, who opposed the stay on the grounds that it and its licensee Ericsson could meet all of Cisco's demand—and MPS saw its sales drop steeply after April 11, 2011.  *See* A58511[180:14-181:2, 181:22-182:9]; 2/4/2012 SynQor Fed. Cir. Br., No. 2011-1191 at 12; A9796[127:4-128:12]; A9934-A9935[27:10-17, 28:17-29:7]; A52087-52111.

38

The indemnity agreement between MPS and Cisco also does not somehow override the evidence the district court relied on in finding no inducement. As an initial matter, this was not some agreement to enter into sales that would violate a court order; to the contrary, it clearly contemplated that MPS would cease sales for U.S. use once the injunction took effect. *See* A9933[22:17-24]; A9833[113:25-114:2]; *See* A52011 at ¶ 3. Nor was the district court required to find a nefarious intent behind MPS's decision to enter into an indemnification agreement with Cisco while entering into non-importation agreements with other customers. *See* SynQor Br. at 47. As senior MPS executive Vijay Chetty testified at trial, MPS did not ask Cisco to sign a non-importation agreement "because [MPS] had adequate controls in place with Cisco" to ensure infringing importations would not occur after April 11, 2011. A9832[111:6-11]. That was, of course, the whole point of the labor-intensive red-dot process and packaging notifications, and the district court was able to assess the credibility of MPS's witnesses. Again, the decline in sales after April 11 shows those controls worked. *See* A9934-35[27:10-17; 28:17-29:7]; A52087-111.[4]

---

[4] SynQor faults the district court for not finding that MPS induced

The district court likewise was not compelled to find inducement because MPS did not try to audit *Cisco's* contract manufacturers. *See* SynQor Br. at 48. Cisco implemented the red-dot procedures with its suppliers and contract manufacturers precisely because it was trying to keep accused converters out of U.S.-bound products. Those procedures provided Appellees assurance that Cisco and its contract manufacturers would keep infringing products out of the United States. *See* A9901[60:5-9]. Because MPS "did not receive any complaints" or hear of any "anomalies in the process," it had no reason to question that process. A9934[27:2-9]; *see also* A9935[30:4-11]. SynQor also mischaracterizes the testimony of Tim Brown, another MPS witness. He testified that it is "good routine practice" for a company to audit *its own* contract manufacturers, but he never conceded—as SynQor suggests—that MPS or any other supplier should routinely audit *Cisco*'s contract manufacturers, an impossible task. A9942[59:21-60:10]. Even

infringement based on snippets of deposition testimony from MPS's 30(b)(6) witness, Sandra Harrison. *See* SynQor Br. at 48. But her responses to broad, confusing questions calling for legal conclusions (over MPS's objections), is far less probative than the detailed testimony of Mr. Chetty and Mr. Brown in response to specific factual questions at trial. The district court was entitled to rely on the testimony it heard during the four-day bench trial, make credibility assessments, and give Ms. Harrison's deposition testimony little weight.

if a supplier arguably could have tried to make such an audit, it is well-settled that "recklessness or negligence" is not enough to support a "finding of induced infringement." *Commil*, 720 F.3d at 1366; *see also Global-Tech*, 131 S. Ct. at 2070-71.

In sum, the evidence amply supports the district court's conclusion that MPS lacked the intent or knowledge required to induce infringement by Cisco after April 11, 2011.

> **2.    Bel Fuse Did Not Have The Knowledge Or Intent Required To Induce Cisco's Alleged Direct Infringement After April 11, 2011**

All of Bel Fuse's post-April 11, 2011 actions likewise demonstrate it lacked the necessary intent to induce Cisco's purported importation of accused converters. Like MPS, Bel Fuse stopped all shipments to Cisco once this Court modified its stay. A9899[49:12-50:1]. Those shipments did not resume until Cisco provided Bel Fuse detailed information on the process it would use to keep its accused converters out of the United States. *See* A9947-A9948[80:14-81:19]; A12601-02. And once shipments resumed, every single shipment of Bel Fuse converters complied with the terms of Judge Ward's injunction and Cisco's red-dot

41

procedures.    *See*    A9944[66:6-67:5];    A9947-A9948[80:14-81:19]; A9949[85:25-86:8].

Nor is there evidence that Bel Fuse "knew" that some of its accused converters were supposedly entering the United States despite the injunction-notice and red-dot safeguards. Quite the opposite. Bel Fuse had no reason "whatsoever" to doubt those safeguards were working. A9948[84:7-15]. Cisco "assured" Bel Fuse that it was keeping converters shipped after April 11 outside the United States and "that they had a documented process that was very tightly controlled." A9948[83:2-21]. Bel Fuse was told the process was "airtight." *Id.* at 83:22-24. Based on this evidence, the district court did not clearly err by finding that Bel Fuse lacked the knowledge or intent required to induce infringement.

SynQor's argument to the contrary again depends on assertions about Bel Fuse's state-of-mind prior to April 2011. *See* SynQor Br. at 45-46. But whatever Bel Fuse may have thought in the past, Bel Fuse understood things had changed by April 11, 2011. *See* A9808[14:10-12]; A9810-A9811[24:17-25:12]; A9803[153:7-154:3]. By April 2011, Bel Fuse knew Cisco was close to incorporating unaccused alternatives into

42

at least some of its products, a transition that was happening sooner than Bel Fuse had expected in January 2011.  A9803[153:7-154:3]; A9808[14:10-12];  A9897-A9898[44:6-15,  46:16,  47:2-17];  A52895-909. And as of April 11, 2011, Appellees' belief that SynQor could not meet most of Cisco's U.S. needs had been rejected by this Court—Bel Fuse was, thus, entitled to rely on SynQor's representations. *See* A52216.

Those  changed  circumstances  significantly  undermine  the purported "admissions" asserted by SynQor, none of which go to Bel Fuse's state of mind after April 11, 2011.  For example, SynQor cites testimony from Bel Fuse's Julie Davies, allegedly establishing that "at the time Bel Fuse sold bus converters to Cisco, Bel Fuse knew that Cisco needed at least some of them for use in the U.S." and "continued to sell to Cisco with that understanding."  SynQor Br. at 45-46 (citing A9802).  But that grossly misrepresents Ms. Davies' testimony.  To be sure, Ms. Davies agreed that some of Bel Fuse's accused converters sold after *January 24, 2011*, while the injunction was stayed, would be used in U.S.-bound Cisco products—and that is all she was asked.  A9802. When  given  the  opportunity,  she  clarified  that  her  understanding changed after April 2011.  A9811[25:6-12]; *see also* A9810-A9811[24:17-

43

25:12]. Indeed, that was the whole point of the extensive red-dot and notice procedures Bel Fuse put in place. Ms. Davies likewise made clear that although at the time Bel Fuse sought a stay of the *SynQor I* injunction it "was not aware of any way for Cisco to meet its U.S. needs" without using infringing Bel Fuse converters, it later had a different understanding based on the changed circumstances. A9808[13:9-13]; A9810-A9811[24:17-25:12]. The district court was entitled to credit testimony about Bel Fuse's post-April 11 actions and state of mind and properly evaluate the changed circumstances relative to when the stay was initially requested.

SynQor's mischaracterizations of Ms. Davies' testimony do not stop there. Nowhere in her testimony did she "admit[] that Bel Fuse never believed 'at any point that [Cisco's] needs had changed' through at least September 30, 2011." SynQor Br. at 46 (quoting A9803-04[155:16-21, 156:5-157:16]). The testimony SynQor selectively quotes admitted only that Bel Fuse never asked Cisco if it needs had changed. But Bel Fuse did not need to ask Cisco whether its needs had changed to understand that they had, and even if it had no understanding about Cisco's needs, the district court was entitled to credit Bel Fuse's reliance

44

on Cisco's representations about what it was doing with red-dot/"Bin C" converters. Indeed, SynQor's gloss on Ms. Davies testimony ignores her other testimony that Cisco transitioned to non-infringing Bel Fuse converters sooner than expected. *See* A9803[153:7-154:3]. The district court heard all the testimony, weighed its credibility, and reached a reasonable conclusion.

SynQor's reliance on Bel Fuse's sales volume also does not render the district court's findings clearly erroneous. *See* SynQor Br. 47. Although Bel Fuse's overall sales volume was higher in the first half of 2011 than its sales volume for the first half of 2010, it does not follow that Bel Fuse somehow "knew" Cisco was (purportedly) importing accused converters into the United States after April 11, 2011 (or that Bel Fuse was willfully blind to that purported fact). At most, the evidence showed Cisco may have (inadvertently) imported a small number of accused converters after April 11. *See* A9965[149:9-22, 150:8-19, 152:5-23]; A9966[153:3-8]; A9967[157:6-19]; A52842-44. But increased volume for that broader period may have also reflected increased sales *before* April 11, or increased reliance on Bel Fuse's converters for use outside the United States as Cisco directed non-

45

accused converters to the United States to meet Cisco's U.S. needs. The district court was not required to draw the inferences most favorable to SynQor. *See East Tex. Med. Center Regional Healthcare Sys. v. Lexington Ins. Co.*, 575 F.3d 520, 525 (5th Cir. 2009).

SynQor's remaining arguments—that Bel Fuse never specifically asked Cisco how it would meet its U.S. needs and never audited Cisco's contract manufacturers—are meritless, erecting standards nowhere found in the law. Regardless, the district court's conclusion that SynQor could not prove inducement given Bel Fuse's affirmative steps to avoid importation while making lawful foreign sales (including the red-dot and notice procedures) cannot be clearly erroneous. Again, recklessness or negligence is not enough. *See Global-Tech*, 131 S. Ct. at 2070-71; *Commil*, 720 F.3d at 1366. Bel Fuse took reasonable actions to avoid inducing infringement after April 11, and the district court was not clearly erroneous to find that those actions "demonstrate[d] a lack of intent." A35.

### 3. Astec Did Not Have The Requisite Knowledge Or Intent To Induce, And SynQor Failed To Prove Direct Infringement By Juniper

#### a. Astec Did Not Induce Cisco's Alleged Infringement During The Relevant Time

46

## Periods

The district court correctly found that Astec did not induce Cisco's alleged infringement during two different time periods—first between February 1, 2011 and March 16, 2011, and then again from April 11 onward. Astec's actions during both of those periods demonstrate it lacked the requisite intent and knowledge for inducement.

Every shipment of accused Astec converters to Cisco between February 1 and March 16, and again after April 11, 2011, included the red-dot safeguards. *See* A9827-A9828[89:16-90:13; 92:4-20; 93:5-13]. Those shipments likewise complied with, and went beyond, the injunction-notice requirements, clearly identifying the products as exclusively for foreign use. *Id.* Each shipment, for example, included notice of the injunction "on every single box" and on the invoice. A9822[71:25-72:21]. And, to ensure those notices were not overlooked, the notices were printed on prominent, orange labels. *See id.*; A12910.

Implementing those safeguards required significant changes to Astec's shipment processes. Astec acquired special supplies, such as "a special epoxy material" so that the red dots would not "fall off in Cisco's manufacturing process," and adjusted its own manufacturing process so

that the red dots would be affixed to the converters at the appropriate time. A9827[89:16-90:1]. Many converters that had already been packaged and prepared for shipment had to be unpacked, marked with a red dot, and repackaged for shipment to Cisco. *Id.* at 90:3-11.

There is simply no evidence that Astec undertook these costly actions with the knowledge or intent that Cisco (purportedly) would ignore these safeguards and continue importing Astec's converters into the United States. To the contrary, Astec was never told Cisco (purportedly) used any accused converters in end-products bound for the U.S. *See* A12918-20; A9827-28[90:19-93:13]. Astec, for its part, believed that if Cisco needed Astec converters for U.S. products, Cisco would make a specific request to either have the converters shipped to a U.S.-based facility or ask Astec not to mark the foreign converters with the red-dot and injunction-notice safeguards. A9817[50:5-52:6]; A9828[93:14-94:12]. As the district court correctly recognized, Astec's actions and understanding are simply not those of a company that is intending or encouraging U.S. importations.

Indeed, when Cisco wanted Astec to ship converters that could potentially be used in U.S.-bound products, it asked for it. That is

exactly what occurred between March 16 and April 11, 2011, before this Court modified the stay of the *SynQor I* injunction. *See* A9817[50:5-52:6]. During that time, while the injunction was fully stayed, Astec shipped converters overseas that were not marked with red dots and not shipped with notices that they were exclusively for foreign use. A10064-65; A9817[50:5-52:6]. That is why the district court awarded damages for Astec's sales to Cisco from March 17 to April 11. A31.

The district court was not required, as SynQor contends, to also find that Cisco's March 16, 2011 email established that Astec "knew its early Bin C-labeled converters were not being handled through any purported bin system." SynQor Br. at 44. Cisco did not say it was using those converters in the U.S.; rather it just asked Astec to ship converters in the future that could potentially be used in the U.S. Indeed, Astec's John Groves testified at trial that Astec believed Cisco would not import any converters previously marked with a red dot into the United States. A9817[50:5-52:6]. From Astec's perspective, this was just about shipments made after March 16, 2011, while the injunction remained fully stayed. *Id.* The district court was entitled to credit Mr. Groves' testimony.

Nor is there any inherent inconsistency between Astec implementing the red-dot and injunction-notice safeguards in February 2011 and its representations to this Court at the same time that Cisco needed to continue buying Astec's bus converters for use in U.S. end-products. Astec wanted to minimize or stop potentially infringing sales, A9825[81:8-82:10], but recognized it may not be able to without harming Cisco's business. Indeed, when Cisco eventually did need Astec's products to meet its U.S. needs, Astec temporarily suspended the red-dot and injunction-notice safeguards between March 17 and April 11, until this Court modified the stay.

Finally, SynQor's arguments for why the district court clearly erred in finding no inducement after April 11, 2011, largely track the same points already discussed above. Increased sales volume over limited periods of time, and good-faith representations in stay applications, do not trump the evidence of what Astec actually did to prevent importation of accused products after April 11. Given the evidence at trial, there is nothing clearly erroneous about the district court's factual finding that when Astec implemented the red-dot and

notice procedures, it meant them, and thus there could be no inducement.

### b.    Juniper Did Not Directly Infringe

For Astec to be liable for its foreign converter sales to Juniper, SynQor was first required to prove at least one act of direct infringement by Juniper after January 24, 2011.[5] *See Limelight Networks, Inc. v. Akamai Tech., Inc.*, 134 S. Ct. 2111, 2117 (2014) ("[O]ur case law leaves no doubt that inducement liability may arise but only if [there is] … direct infringement." (quotation marks omitted)).  In other words, SynQor needed to prove that Juniper actually imported an accused Astec converter after that date.  After listening to all of the evidence presented at the four-day bench trial, the district court correctly found SynQor failed to do so.  *See* A23.

Indeed, Astec presented substantial evidence establishing that no importations of accused converters by Juniper occurred.  *First*, prior to

---

[5] Astec's converter sales at issue in *SynQor I* involved converter shipments both to Juniper's U.S locations and its foreign locations. Things changed after the *SynQor I* verdict.  The evidence in this case showed that after January 24, 2011, Astec did not ship any accused bus converters to Juniper's U.S. locations.  A9820[62:9-13]; A9953[102:16-20].  All of Astec's sales to Juniper after January 24, 2011, were to Juniper and its contract manufacturers outside the United States for use outside the United States.

January 2011 (*i.e.*, the sales at issue in *SynQor I*) it is true that Astec shipped the accused converters not only to to Juniper's overseas facilities, but also its U.S. facilities. In contrast, after January 24, 2011, Astec did not ship any accused converters to Juniper in the United States—all shipments were made to Juniper's overseas manufacturers for overseas use. A9820[62:9-13]. *Second*, Juniper agreed on January 12, 2011, that any product it imported to the United States would not contain accused Astec converters. A9813[33:12-19]; A9951-52[96:24-97:3]. *Third*, Mr. Groves testified that Astec knew Juniper had multiple sources for most of its bus converter needs, and Astec understood that Juniper used these other sources—not Astec converters—for its U.S. products. A9820[63:12-14]; A9824[79:23-80:6].

It was thus perfectly reasonable for the district court to conclude that Juniper did what it promised to do and did not import any products containing Astec converters into the United States. Because Astec did not ship any converters to Juniper in the United States, Juniper likewise could not have directly infringed by manufacturing products in the United States with Astec converters. The district court was accordingly entitled to conclude that Juniper did not engage in any

52

infringing acts and, if anything, found sources of converters—other than post-Janaury 24, 2011 Astec converters—to satisfy any U.S. demand.

None of the evidence SynQor cites *required* the district court to find otherwise. As an initial matter, SynQor concedes it produced no *direct* evidence of infringement by Juniper. SynQor Br. at 51. Instead, SynQor contends that it proved direct infringement through circumstantial evidence consisting of a January 14, 2011 declaration of Juniper's David Owen, made in support of Astec's opposition to SynQor's injunction request, A10210-214 at ¶3, the Juniper Indemnity Agreement, A12698-700, and the *SynQor I* importation ratio of 50%. A9863[86:9-21].[6]    The district court was not required to credit that

---

[6] The cases on which SynQor relies are inapposite. Both *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358 (Fed. Cir. 2012), and *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317 (Fed. Cir. 2009) involved grants of summary judgment of no direct infringement. On appeal, this Court reversed *summary judgment* on the basis that the circumstantial evidence, when viewed in the light most favorable to the patent owner, created a fact question precluding summary judgment. *Mirror Worlds, LLC v. Apple, Inc.*, 692 F.3d 1351 (Fed. Cir. 2012), involved a JMOL of no direct infringement after a jury verdict finding direct infringement. This Court affirmed the JMOL of no direct infringement and noted in passing that a party may prove direct infringement with circumstantial evidence. Here, there was a trial and consequently no obligation to view the evidence in the light most favorable to SynQor. Quite the opposite, *SynQor* had the burden of proof. *See East Tex. Med. Center*, 575 F.3d at 525.

evidence or the inferences SynQor attemped to draw from it, when SynQor wholly failed to produce any testimony (deposition or trial) from Juniper concerning how many products containing Astec converters it *actually* imported—if any—after January 24, 2011. This was so even though SynQor and its damages expert were aware that Juniper also sourced converters from Lineage and Ericsson. A9890-91[16:19-17:3].

SynQor argues that, because Juniper declared and Astec argued (based on the Owen declaration) that harm could result if the injunction were not stayed, the district court was required to find that Juniper directly infringed by importing product after January 24, 2011. However, it is entirely reasonable for Juniper and Astec to seek a stay because of likely harm and at the same time for Juniper to search for all reasonable alternatives to avoid the likely harm (or incur the harm). SynQor's theory of liability required the district court to believe that, after asking for the stay, Juniper sat back and did nothing to mitigate the future harm it described in its declaration.[7] Nothing in law or logic

---

[7] Indeed, because SynQor knew that Juniper had agreed not to import product containing Astec's converters shipped to Juniper overseas, and because SynQor could see from Astec's quarterly sales data that no converters were shipped to Juniper in the U.S., *see* A57850-51, SynQor

obligated the district court to reach that conclusion. Indeed, the Owen declaration advised this Court that it would seek to mitigate the likely harm of the injunction by qualifying a SynQor replacement for Astec's IBC28 converter (¶13) and by designing out Astec's IBC17 converter (¶12). A10210-214. Although the Owen declaration might provide some evidence that Juniper expected to have continuing U.S. demand for products that had previously used accused Astec converters, it is not evidence compelling a finding that Juniper imported any product that contained the accused Astec converters after January 24, 2011.

Similarly, the Juniper indemnity agreement, which was executed after Juniper agreed not to import infringing product and after the injunction was stayed, provided Astec protection if Juniper intentionally, negligently or accidentally imported product with Astec converters—in violation of the agreement—or if Juniper required Astec to ship converters into the United States during the stay. *See* A12698-700. However, the Indemnity Agreement has no statement or necessary implication that infringing importations or sales into the United States would necessarily occur. Further, as Astec's Richard Sung testified, it

has no excuse not to have sought discovery directly from Juniper about how it was meeting U.S. demand, like it did from Cisco.

was Astec's intent for the indemnity obligation to create a disincentive to importing or manufacturing product in the U.S., and an incentive for Juniper to deal with SynQor.  A9829[98:20-99:6].  The district court was entitled to credit that testimony and find that the disincentive worked.

Absent direct infringement by Juniper, no liability can attach to Astec for selling accused converters overseas after January 24, 2011, and based on the evidence of record, the district court did not clearly err in finding SynQor failed to carry its burden of proof.[8]

## B.    The District Court Did Not Clearly Err In Finding SynQor Could Not Meet The Exacting Standard For Willful Blindness

SynQor cannot prove that Appellees had the requisite intent to induce infringement when they took extensive steps to ensure their

---

[8] Even if Juniper violated its agreement not to import and violated the yellow dot procedure it asked Astec to implement, Astec cannot be liable for Juniper's alleged direct infringement because Astec did not knowingly induce Juniper to import Astec's converters.  There is no dispute that Juniper was aware of the *SynQor I* verdict and aware of the injunction at all relevant times.  Astec undertook reasonable safeguards, such as securing Juniper's agreement not to import product containing Astec converters, implementing with Juniper the "yellow-dot" marking protocol on all converters sold after January 24, 2011, and requiring Juniper to indemnify Astec for any harm caused to SynQor up to $200 per converter.  Although the district court did not reach the issue, the evidence compels a finding that Astec did not intend to induce infringement, and this Court may affirm on those grounds as well.

accused products were not imported into the United States. So it also argues Appellees must have been willfully blind, because they purportedly knew Cisco (and, in Astec's case, Juniper), had U.S. needs but continued selling anyway. That argument fails on the law and the facts.[9]

Relying chiefly on Appellees' arguments in support of their request for a stay of the *SynQor I* injunction, SynQor asserts that Appellees knew Cisco had U.S. needs and, because they never asked Cisco how it would meet U.S. needs, willfully blinded themselves to the (purported, but unsubstantiated) possibility that Cisco would keep importing accused converters—even though they were working with Cisco to implement the procedures to ensure those converters would not be imported. That argument is specious. There is no law to support SynQor's "ask" requirement, and tellingly it cites none. Indeed, the idea that MPS, Bel Fuse, and Astec should have checked up on Cisco (much less *Cisco's* contract manufacturers) is inconsistent with the injunction order itself, which rejected SynQor's request that Appellees

---

[9] As noted above, because SynQor failed to prove direct infringement by Juniper, there can be no inducement by Astec for its foreign sales to Juniper, whatever Astec's mental state.

be required to investigate their customers before selling them accused converters. *See* A51841-42; A52520-21.

In any event, willful blindness requires "deliberate actions to avoid confirming a high probability of wrongdoing" such that those companies "can almost be said to have actually known the critical facts." *Global-Tech*, 131 S. Ct. at 2070-71. The evidence demonstrates there were no such actions here; to the contrary, Appellees affirmatively implemented the red-dot and notice-provision procedures to prevent importation, relied on Cisco's assurances about the treatment of red-dot/"Bin C" converters, and were also aware that Cisco had alternatives (based on what SynQor told them as well as their own development of non-accused alternatives).

As an initial matter, the premise that Appellees were required to discuss Cisco's needs to know whether Cisco had alternatives available is plainly false. In its April 11, 2011 order, this Court confirmed that *SynQor* itself could meet Cisco's U.S. needs for three converter models that "account for over 67% of Cisco's disclosed U.S. sales of end products containing" accused converters. A52216. Indeed, SynQor specifically

told MPS that it could meet even more of Cisco's needs. *See* A9792-A9793[112:23-113:9].

Cisco, moreover, had disclosed that licensed Ericsson converters were qualified for use in 40% to 60% of the relevant products and that it intended to continue purchasing Ericsson converters for use in those products. A58511[180:14-181:2, 181:22-182:9]. SynQor had even argued that a combination of Ericsson and SynQor parts could meet all of Cisco's U.S. needs. *See* 2/4/2012 SynQor Fed. Cir. Opp. to Cisco's Mot. to Intervene, No. 2011-1191 at 12 ("It is possible that the combination of SynQor and Ericsson already qualified parts cover the entirety of Cisco's sales volume."); A9796[127:4-128:12].

Appellees also knew by April 2011 that Cisco was close to replacing some accused converter models with non-infringing, fully regulated converters. A9897-A9898[44:6-15, 46:16, 47:2-17]; A52895-909. SynQor addresses none of these facts in its brief, all of which belie the notion that Appellees were somehow willfully blind.

Nor is there any evidence that, if Appellees had asked Cisco, they would have actually uncovered evidence of Cisco's purported infringement, as *Global-Tech* requires for willful blindness. 131 S. Ct.

at 2070-71.  As Cisco's Jeff Purnell testified at trial, Cisco met its U.S. needs (to the extent that it could) by using unaccused, fully regulated converters, parts from SynQor and other suppliers, and its pre-April 11, 2011 inventory, for which SynQor received royalties.  *See* A9896-A9897[38:22-39:4, 41:8-21, 42:10-13].  He further testified that Cisco adhered to the red-dot/"Bin C" process and did not intentionally import accused converters that had been so marked, even though that meant Cisco sometimes could *not* meet U.S. needs.  A9898-A9899[48:12-49:2].  The notion that Appellees would have learned anything different than what Cisco's representative told the district court is unsupported and, in fact, directly contradicted by the evidence that the district court saw.  Indeed, Cisco's conduct confirms its compliance with the procedures it put in place:  When Cisco wanted converters for U.S. needs, it said so, as it did with Astec.

The indemnity agreements add nothing to SynQor's willful-blindness allegations.  *See MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005).  Its reliance on the indemnity agreements in fact ignores the purpose of those agreements.  The indemnity agreements assign financial

responsibility for continued sales to Cisco. They are not agreements to enter into sales that would violate a court order. *See* A9933[22:17-24]; A9833[113:25-114:2]; A9946[75:1-25]; A9824-A9825[80:7-82:10]. Despite SynQor's arguments to the contrary, the agreements also merely authorized—but did not *require*—Appellees to supply accused converters to Cisco through September 30, 2011. *See* A9801-A9802[148:9-149:5]; A9946[73:17-25]; SynQor Br. at 42, 45, 47. Indeed, the agreements each explicitly acknowledge that MPS, Bel Fuse, and Astec are entitled to "discontinue supplying" converters for Cisco's U.S.-bound products once the injunction becomes effective. *See* A52011 at ¶ 3; A12964 at ¶ 3; A12580 at ¶ 3. And, as all of the actions Appellees took after April 11 demonstrate, that is exactly what they did.

*        *        *

The district court was not clearly erroneous in finding Appellees did not induce infringement during the relevant times, and this Court should affirm.

## II.   The District Court Correctly Found MPS, Bel Fuse, and Astec's Infringing Sales Between January 25 and April 11, 2011, While The Injunction Was Stayed, Were Not Willful

Appellees were found liable for certain sales between January 25 and April 11, 2011, and the district court awarded damages accordingly. A40.  Not content with that damages award, SynQor now insists the district court should have awarded enhanced damages for willfully inducing infringement.  The district court was exactly right, however, that any inducement during the stay of an injunction is not willful.

### A.   SynQor Is Precluded From Challenging The District Court's Willfulness Finding

As an initial matter, this Court need not reach the merits of SynQor's argument because the district court in *SynQor I* reached the same conclusion, finding that "any infringement by Defendants during the stay of the injunction is not willful."  A57694.  SynQor did not appeal that decision and is now bound by it.

"Collateral estoppel, also known as issue preclusion, shields a defendant from having to litigate issues that have been fully and fairly tried in a previous action and decided adversely to a party." *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1379 (Fed. Cir. 1999); *see also Montana v. United States*, 440 U.S. 147, 153 (1979).  This

doctrine applies when: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary to the decision." *Amrollah v. Napolitano*, 710 F.3d 568, 571 (5th Cir. 2013).

Each of those requirements is satisfied here. SynQor raises the same willfulness issue—and indeed many of the same arguments—it pressed in *SynQor I*. *Compare* A57028-32; A57277-78; A57281, *with* SynQor Br. at 52-57. The district court in *SynQor I*, like the district court here, rejected those arguments in an order that was incorporated into a final judgment. *See* A57843-49. And resolving whether post-injunction sales were willful was necessary to that decision. The district court ruled on that issue as part of its explanation for why an award for post-injunction damages was premature and would require additional evidence and discovery. *See* A57693-94. SynQor could have appealed that decision in *SynQor I*, but chose not to. Because it chose to forfeit its appellate rights, it cannot collaterally attack that decision now. *See Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008); *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999).

63

**B.    The Stay Of The Injunction Establishes the Post-Injunction Conduct of MPS, Bel Fuse, and Astec Was Not Objectively Willful**

Should the Court reach the merits of SynQor's argument, the decisions below and in *SynQor I* both correctly held that Appellees did not willfully infringe.  *See* A34, A57694.  Indeed, this Court has already held that infringement during the stay of a permanent injunction is not willful.  *See Amado*, 517 F.3d at 1362.  In *Amado*, Microsoft was found to infringe and enjoined from making further infringing sales, but that injunction was stayed pending appeal by the district court, and Microsoft continued making infringing sales throughout the stay period.  *See id.* at 1356.  The district court in that case subsequently concluded that Microsoft willfully infringed by making infringing sales during the stay period and ordered Microsoft to pay a trebled reasonable royalty for those sales.  *See id.* at 1361.  This Court vacated the supplemental damages award.  *See id.* at 1362.

This Court held that the district court in *Amado* erred by "center[ing] its damages assessment on willful infringement."  *Id.* at 1362.  "Willfulness," this Court held, "is not the inquiry when the infringement is permitted by a court-ordered stay."  *Id.*  The decision in

*Amado* then listed a number of factors courts should consider when assessing damages for infringing acts occurring after the court "concludes that an injunction is warranted, but is persuaded to stay the injunction pending an appeal," such as changed bargaining positions and the infringer's ability to immediately comply with the injunction. *Id.* Willful infringement did not make the list.

The only plausible reading of *Amado* is that continued acts of infringement during the stay of a permanent injunction are not willful. That is why this Court said that willfulness "is not the inquiry" and then outlined a multi-factor inquiry for "the assessment of damages" that never even mentions willfulness. The absence of willfulness from *Amado*'s multi-factor inquiry also disproves SynQor's alternative reading that *Amado* merely held willfulness is relevant, but "not *all* that matters." SynQor Br. at 54.

*Amado*'s holding that infringement is not willful during a stay makes perfect sense. A stay pending appeal is almost invariably justified in part by "where the public interest lies," *Nken v. Holder*, 556 U.S. 418, 426 (2009), and the public harm that would result if the infringing activity immediately ceased. But few adjudicated infringers

would continue meeting the public's needs at the risk of treble damages. That would thwart a significant reason for granting a stay in the first place. There is simply no basis in law or logic to enter a stay to protect the public but simultaneously find the fact that a defendant did what the stay authorizes constitutes willful infringement punishable by up-to-treble damages.

That is not a theoretical concern. The stay here was based in large part on protecting the public. As Appellees explained to this Court, in seeking a stay of the *SynQor I* injunction, immediately cutting off Cisco's supply of converters could "affect a wide cross-section of the public negatively," from telecommunications providers to financial institutions. A10415-10416; A10751; A10770-10771. Appellees were not acting in bad faith—as willfulness requires—by acting consistent with this Court's grant of a stay, and SynQor offered no clear and convincing evidence to the contrary.

This Court's decision in *Bott v. Four Star Corp.* does not, as SynQor contends, require ignoring *Amado* or the common-sense principles its holding reflects. *See* 807 F.2d 1567, 1573 (Fed. Cir. 1986), *overruled on other grounds by A.C. Aukerman Co. v. R.L. Chaides Const.*

*Co.*, 960 F.2d 1020 (Fed. Cir. 1992).  As an initial matter, *Bott* is likely no longer good law.  *Bott* found willfulness during a stay by applying the pre-*Seagate* willfulness standard and incorrectly treating willfulness as solely a question of fact.  *See id.* at 1572; *Bard*, 682 F.3d at 1006 (holding objective willfulness is a question of law).  It is also easily distinguishable.  In that case, the district court repeatedly warned the defendant that its sales during the stay would be willful.  *See Bott*, 807 F.2d at 1573.  Here, the district court in *SynQor I* expressly found "any infringement by Defendants during the stay of the injunction is *not* willful."  A57694 (emphasis added).[10]

Moreover, SynQor cannot even satisfy the willfulness requirements on their own terms, regardless of *Amado* and *Bott*.  Under this Court's precedent, there are objective and subjective prongs that must be met to establish willful infringement.  *First*, "a patentee must show by clear and convincing evidence that the infringer acted despite

---

[10] SynQor's reliance on *Joyal Prods., Inc. v. Johnson Electric N. Am., Inc.*, 2009 WL 512156, *13-14 (D.N.J. Feb. 27, 2009), is unavailing.  There the defendant *stipulated* that it willfully infringed.  The question the court considered was not whether damages from sales during a stay of an injunction were willful, but what the proper royalty should be after entry of judgment, based on the totality of the circumstances.  The district court here determined the proper royalty and SynQor did not appeal that finding.

an objectively high likelihood that its actions constituted infringement of a valid patent." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (*en banc*). *Second,* once this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively defined risk was either known or so obvious that it should have been known to the accused infringer. *Id.* This Court recently clarified that objective willfulness is a question of law that is defeated "where an accused infringer relies on a reasonable defense to a charge of infringement." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1005-06 (Fed. Cir. 2012).

SynQor's willfulness assertions falter at the threshold determination of objective willfulness. The stays entered by this Court establish that MPS, Bel-Fuse, and Astec each had objectively reasonable defenses when they made infringing sales between January 24 and April 11, 2011; otherwise, no stay could have been granted. *See* A10096; A56992; A56996; A57008. As the Supreme Court has explained, a stay motion ""is a motion, not to [a court's] inclination, but to its judgment; and its judgment is to be guided by sound legal principles."" *Nken*, 556 U.S. at 429 (quoting *Martin v. Franklin Capital*

68

*Corp.*, 546 U.S. 132, 139 (2005)).  Those legal principles require a finding that "the stay applicant has made a strong showing that he is likely to succeed on the merits." *Nken*, 556 U.S. at 434 (quotation marks omitted).

Because the arguments about the merits in the stay briefing to this Court focused on the invalidity of SynQor's patents, *see, e.g.*, A10755-61, the decision to issue the stay necessarily reflected that those invalidity arguments were reasonably "likely to succeed on the merits," *Nken*, 556 U.S. at 434 (quotation marks omitted).  It follows that those arguments must have been "reasonable." *Bard*, 682 F.3d at 1006; *see also Advanced Fiber Technologies (AFT) Trust v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1377-78 (Fed. Cir. 2012) (holding invalidity defenses are relevant to objective willfulness).  Indeed, it would make no sense to conclude that an argument reasonably likely to succeed on the merits was nonetheless unreasonable.

SynQor attempts to downplay the significance of this Court's January 31 and February 1, 2011 stay orders because they were "entered 'temporarily … pending this court's consideration of the papers submitted,' not on the merits." SynQor Br. at 56 (quoting A57008).

That ignores this Court's April 11, 2011 order, which although it narrowed the scope of the stay, was on the merits and specifically recited the likelihood-of-success-on-the-merits requirement in granting a narrowed stay. *See* A10096-99 (calling that requirement "critical"). It does not matter that the April 11 order came after the infringing sales ceased. Regardless of when it issued, this Court's order establishes that Appellees' invalidity defenses were objectively reasonable and that their actions were not objectively willful. *Cf. DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1336 (Fed. Cir. 2009) (holding that "'[t]he state of mind of the accused infringer is not relevant'" to objective willfulness) (quoting *Seagate*, 497 F.3d at 1371).[11]

Moreover, the January 31 and February 1, 2011 stay orders were not mere administrative acts staying an injunction for a day or two: They remained in place *for over two months*. *See* A10096; A56992; A56996; A57008. It is implausible that this Court left those stays in place for months while disregarding the Supreme Court's requirement

---

[11] This Court's April 11, 2011, order also renders irrelevant Judge Ward's decision not to grant a stay in January. *See* SynQor Br. at 55. Regardless of what Judge Ward thought about the merits or any of the other stay factors, this Court disagreed.

that a stay can only be granted where there is a showing of reasonable likelihood of success on the merits.

## III.  The District Court Correctly Found That This Is Not An Exceptional Case

The district court properly denied SynQor's motion for an exceptional case finding and attorney's fees.  *See* A38.  Because the district court properly found that Appellees did not willfully infringe, SynQor's principal challenge to the district court's finding that this is not an exceptional case is meritless.

SynQor's alternative argument—that the district court applied the wrong legal standard—comes too little, too late.  SynQor did not dispute the legal standard for evaluating whether a case is exceptional below, instead agreeing that "[c]ases qualifying as exceptional under § 285 'usually feature some material, inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Federal Rule of Civil Procedure 11, or like infractions.'" A38 (quoting *Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.*, 459 F.3d 1311, 1321-22 (Fed. Cir. 2006)); A9105 (likewise quoting *Serio-US*, 459 F.3d at 1321-22).  "An argument

not raised before the district court cannot be asserted for the first time on appeal," and SynQor accordingly waived its attack on the legal standard the district court applied. *Nunez v. Allstate Ins. Co.*, 604 F.3d 840, 846 (5th Cir. 2010) (internal quotations omitted).

It makes no difference that the Supreme Court changed the "exceptional case" standard after the district court issued its decision. This Court applies Fifth Circuit law to determine whether waiver has occurred. *See Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1352 (Fed. Cir. 2003). Under that law, intervening Supreme Court decisions do not excuse untimely arguments. *United States v. Mares*, 402 F.3d 511, 513 (5th Cir. 2005); *Martinez v. Texas Dep't of Criminal Justice*, 300 F.3d 567, 573-74 (5th Cir. 2002).

But even if SynQor had preserved this argument, it would not change the result. No reasonable factfinder could conclude this is "an 'exceptional' case" that "stands out from others with respect to the substantive strength of [SynQor's] litigating position." *Octane Fitness v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1755 (2014). SynQor is the appellant in this court for a reason, and it is not because its case was so strong. It *lost* almost every single substantive issue in this case.

72

In addition to the issues addressed in this appeal, the district court likewise rejected SynQor's argument that MPS, Bel Fuse, and Astec violated the district court's injunction and should be held in contempt. A36-37. And it cut SynQor's royalty base almost in third and rejected SynQor's proposed royalty rates in their entirety. A26-28. Indeed, the damages SynQor recovered reflects just how little success it had in this case: SynQor sought more than $33 million and was awarded less than $3 million. A1-2; A8520*;* A9022; A10005[98:11-15]. The only thing exceptional about this case is the weakness of SynQor's positions.

SynQor's arguments for why this case is exceptional are of a piece with the other meritless positions it has taken in its case. According to SynQor, this case is exceptional because of the supposedly irreparable harm to SynQor's goodwill caused by the Appellee's continued sales between January and April 2011. *See* SynQor Br. at 58-59. That amounts to a veiled attack on this Court's decision to stay the injunction. Those sales were made "with the imprimatur[] of the court-ordered stay." *See Amado*, 517 F.3d at 1362. There is nothing inappropriate—let alone exceptionally inappropriate—about making

73

sales this Court has specifically permitted. SynQor recovered its damages for infringing sales, it is entitled to nothing more.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the district court.

Dated:   October 20, 2014

/s/ *Albert B. Deaver, Jr.*
Albert B. Deaver, Jr.
SUTTON MCAUGHAN
DEAVER PLLC
Suite 900
Three Riverway
Houston, TX
(713) 800-5700

*Counsel for Artesyn*
*Technologies, Inc. and*
*Astec America, Inc.*

*/s/ Steven N. Williams*
Steven N. Williams
MCDOLE WILLIAMS, PC
Suite 2750
1700 Pacific Avenue
Dallas, TX 75201
(214) 979-1122

*Counsel for Bel Fuse, Inc.*

*/s/ John C. O'Quinn*
John C. O'Quinn
Jason M. Wilcox
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005-5793
Telephone:  (202) 879-5000

Steven Cherny
KIRKLAND & ELLIS LLP
601 Lexington Avenue
Citigroup Center
New York, NY 10022
Telephone: (212) 446-4800

*Counsel for*
*Murata Power Solutions, Inc.,*
*Murata Electronics*
*North America, Inc. and*
*Murata Manufacturing  Co., Ltd.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 13,941 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Century Schoolbook font.  As permitted by Fed. R. App. P. 32(a)(7)(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  October 20, 2014                     */s/ John C. O'Quinn*
                                              John C. O'Quinn

# CERTIFICATE OF SERVICE

I hereby certify that, on this 20th day of October, 2014, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Federal Circuit via CM/ECF, which will send notice of such filing to all registered CM/ECF users.


*/s/ Jason M. Wilcox*
Jason M. Wilcox

**Law Firm:**       Kirkland & Ellis LLP
**Address:**        655 Fifteenth St, N.W.
**City, State, ZIP:** Washington, DC 20005
**Telephone:**      (202) 879-5000
**FAX:**            (202) 879-5200
**E-mail Address:** jason.wilcox@kirkland.com